COMMONWEALTH *vs.* BETTY J. WILLIAMS.

Middlesex.   January 2, 1973. — October 3, 1973.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY,
& WILKINS, JJ.

*Evidence,* Admissions and confessions. *Constitutional Law,* Admissions
and confessions. *Pleading, Criminal,* Bill of particulars. *Jury and
Jurors. Practice, Criminal,* Judicial discretion, Capital case. *Homicide.*

Oral and written admissions of guilt made in custody without counsel by a
defendant charged with first degree murder were properly allowed in
evidence at trial even if the defendant with poor judgment volunteered
the admissions in the hope for leniency, where she had been fully ad-
vised of. her rights to remain silent and to have counsel and freely,
without threat or promise by the authorities, and intelligently waived
such rights in making the admissions. [147-149]

The Commonwealth in a murder case was not required to specify in a bill
of particulars the type of first degree murder it intended to prove, and
sufficiently specified the means by which the crime was committed by
stating "asphyxia due to strangulation by ligature — multiple blunt
force injuries." [149]

Error in denial of a motion, by a black defendant charged with murder of
a white person, to dismiss the indictment on the ground that only one of
more than one hundred persons called on the venire was black did not
appear where the defendant failed to show a systematic exclusion of
blacks on the venire. [149-150]

The possibility that defence counsel's irksome tactics prejudiced the jury
against the defendant at a murder trial neither constituted reversible er-
ror nor warranted relief under G. L. c. 278, § 33E. [150-151]

Where the defendant in a murder case strangled the victim to quiet him
when he violently attempted to thwart a surreptitious removal of money
from his clothing by an accomplice of the defendant, but the defend-
ant's acts in a rapid sequence of events were spontaneous rather than
premeditated, this court, under G. L. c. 278, § 33E, vacated a verdict of
murder in the first degree even though such verdict was warranted by the
evidence, and ordered a verdict of murder in the second degree to be
entered. [151-152]

INDICTMENT found and returned in the Superior Court on
September 15, 1970.

The case was tried before *Ford, J.*

*Michael R. Pizziferri (Joseph A. Todisco* with him) for the defendant.

*Terence M. Troyer,* Assistant District Attorney (*Barbara A. H. Smith,* Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, J.   The defendant appeals under G. L. c. 278, §§ 33A-33G, from a conviction for murder in the first degree of one Leo J. Bourgault. The jury, under procedure which was appropriate at the time of trial, recommended that the sentence of death be not imposed, and the defendant was sentenced to life imprisonment.

There was evidence from which the jury were warranted in concluding that about 1 A.M., on the morning of August 17, 1970, the victim Bourgault hired a room at a motor inn in Watertown. He entered the assigned room with the defendant and another girl named Elaine Soares. The defendant was nineteen years old, just short of her twentieth birthday, and the other girl was about the same age. Bourgault registered Elaine Soares as his wife and the defendant as her sister. He had paid money to each of the girls to engage in sexual acts with him in the motel room. By reason of a childhood illness, Bourgault had very limited use of his legs and was unable to walk without the use of crutches and a leg brace. Above the waist, he was well developed.

Shortly after the three entered their room there was a disturbance and the motel night clerk went to the room to ask them to be more quiet. The defendant answered the door but he was unable to see beyond her into the room. The defendant stated that Bourgault was having an argument with his wife and that they would quiet down. The disturbance ended. About an hour later, Soares and the defendant left in Bourgault's car. In the morning, Bourgault was found dead in one of the beds, bound and gagged. His death had resulted from strangulation by ligature, and there was some evidence that other extreme violence had been inflicted upon him. His gold ring was missing, and on the morning of August 17 the defendant sold this ring to a man in Boston for $30.

1. The proof against the defendant consisted in large measure of several statements in the nature of admissions. The defendant assigns as error the judge's denial, after hearing, of her motion to suppress these statements. These included a written statement to the police which the defendant signed after making changes, a stenographic transcript of an interview between the defendant and the police, and verbal testimony of statements made by the defendant to an acquaintance of hers. In substance these statements showed that Soares and the defendant determined to steal Bourgault's money surreptitiously. While the defendant was having sexual contact with Bourgault, Soares attempted to take money from his trousers but was detected. Bourgault cried out and began to strike the defendant and Soares. He was bound and gagged and strangled by means of something tied around his neck.

Other statements imputed to the defendant are in many respects self-serving but, in consideration of the jury's privilege to accept them as credible in selective fashion, her total statements constituted sufficient evidence to warrant the jury in concluding that the defendant was guilty of murder in the first degree on one or all of three separate grounds: because it was a homicide connected with a crime punishable by death or life imprisonment, or because she participated in a deliberately premeditated killing, or because the killing was accomplished with extreme cruelty and atrocity. There was other evidence which tended to corroborate important segments of the defendant's several statements.

There was no error in the admission of the statements in evidence. They were admitted after a lengthy voir dire hearing on the defendant's motion to suppress them. Thereafter the judge made extensive findings of fact, which were warranted by the evidence, and which support his rulings. In substance he found that the constitutional requirements of *Miranda* v. *Arizona,* 384 U. S. 436 (1966), had been met; that the defendant did not have the assistance of counsel at the time that she made the statements but that she "freely, intelligently, knowingly, voluntarily, and willingly waived

her constitutional rights not to talk" and her right to the assistance of counsel. He further found that "in few cases have I seen so many Miranda v. Arizona warnings given to a defendant and so many knowing, intelligent, free, and voluntary waivings of rights."[1]

The judge further found that the defendant volunteered her statements in the hope that she would be given lenient treatment, although he found that nothing was said or done by the authorities by way of threat, or promise of immunity or leniency, to induce her to make the statements. The defendant was about twenty years old at the time of her arrest; she had completed two and one-half years of high school and one month at a business school. Although there was substantial evidence against her apart from her statements, it is a reasonable inference that her admissions added significantly to the strength of the Commonwealth's proof against her. In the light of the present knowledge that the jury reached a conclusion that she was guilty of murder in the first degree, it may be argued that she used bad judgment in answering questions and in declining the assistance of counsel. Any lawyer charged with protecting her interests might well have advised her to remain silent. However, there is nothing in the *Miranda* doctrine that required the authorities to protect this defendant against the consequences of what may now retrospectively be said to be her poor judgment, since she was fully informed of her rights and voluntarily waived them. This is not a case like *Commonwealth* v. *McKenna,* 355 Mass. 313, 319-320 (1969), where the police actively

---

[1] It appears that the judge here is referring in part to a printed questionnaire which was completed and signed by the defendant about 12:45 P.M. on September 21, 1970, during an airplane flight from Chicago to Boston. She was in the custody of Massachusetts police at the time, after she was arrested in Chicago and waived rendition. This questionnaire clearly met the total requirements of the *Miranda* rule. The defendant made most of her admissions at the Watertown Police Station that same afternoon (September 21, 1970) commencing at about 2:55 P.M., and concluding at 4:50 P.M. The transcripts of her interrogation at the police station include some warnings by police concerning her rights. It can be argued that these renewed warnings were deficient, particularly in that they did not specify that the defendant was entitled to have a lawyer with her *during interrogation* and was entitled to discontinue her statements at any time. Even if it is assumed that renewed warnings were required at the police station, it is apparent that the judge accepted as true the police testimony that full *Miranda* warnings were given at the police station prior to the commencement of the stenographic transcribing of the interview.

prevented an attorney from reaching his client. Compare *Commonwealth* v. *Wilbur,* 353 Mass. 376, 382-383 (1967); *Commonwealth* v. *Fisher,* 354 Mass. 549, 554-555 (1968); *Commonwealth* v. *Marsh,* 354 Mass. 713, 718-720 (1968).

2. The trial of this indictment required more than four weeks, and it generated a transcript of more than 3,400 pages. The defendant's attorney saved 613 exceptions and he brought to this court 655 assignments of error. The defendant's brief fails in almost every major respect to conform to the rules of this court. For the most part, it consists merely of a litany of the alleged errors of the trial judge. Nevertheless, we have examined the entire stenographic transcript in the light of all of the assignments of error, and we find that the conduct of the trial was free of error.

We summarize and dispose of some of the assignments of error, as to which some semblance of orthodox argument was advanced before us by the defence. The Commonwealth was not required to specify in answer to a bill of particulars the type of first degree murder it intended to prove (*Commonwealth* v. *McLaughlin,* 352 Mass. 218, 222 [1967]; *Commonwealth* v. *White,* 353 Mass. 409, 413 [1967]) and the Commonwealth sufficiently particularized the means by which the crime was committed when it answered that death was due to "[a]sphyxia due to strangulation by ligature —multiple blunt force injuries." *Commonwealth* v. *Noxon,* 319 Mass. 495, 535-536 (1946). There was no error in the mere fact that the same judge presided over a lengthy evidentiary hearing on the defendant's motions to suppress and presided over the trial in chief before a jury. See *King* v. *Grace,* 293 Mass. 244, 247 (1936); *Berlandi* v. *Commonwealth,* 314 Mass. 424, 453 (1943). The defendant, who is a black charged with the murder of a white man, asserts error in the judge's refusal to dismiss the indictment because only one of the 121 persons called on the venire was a black person, but she fails to make the requisite showing either by affidavit or testimony that there was a systematic exclusion of blacks on this venire. *Commonwealth* v. *Slaney,* 350 Mass. 400, 402 (1966). No error was shown in the examina-

tion or exclusion of jurors. Nor was error shown or anything even approaching substantial argument made, relating to the judge's denial of motions to suppress evidence of photographic identification (*Commonwealth* v. *Wilson,* 357 Mass. 49, 54 [1970]; *Simmons* v. *United States,* 390 U. S. 377, 384 [1968]) and his denial of motions to suppress in-court identification. *United States* v. *Wade,* 388 U. S. 218 (1967). There is no merit to the contention that the judge improperly construed the rules of *Harris* v. *New York,* 401 U. S. 222 (1971), nor has it even been shown that the judge had occasion to apply those principles.

Nor has any error been shown as to the many assignments of error directed toward discretionary rulings of the judge. These involved for the most part the denial of various motions of the defendant, and in no instance has abuse of discretion been shown, as for example: motion to sequester witnesses; for extra daily copy of the stenographic transcript; for copy of certain documentary evidence; for allowance of additional expense money for investigation; for continuance of the case pending interlocutory appeal to the Supreme Judicial Court. G. L. c. 278, § 28E, inserted by St. 1967, c. 898, § 1. As to the last described motion, it was not shown that the refusal to continue the case prevented a presentation of an interlocutory motion to the Supreme Judicial Court.

3. We have determined that the rulings of the judge were free of error. Nevertheless, since this is a capital case, we have a further duty under G. L. c. 278, § 33E. That statute "consigns the facts as well as the law to our consideration, gives us the power and duty exercised by a trial judge on a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice. . . . If upon our examination of the facts, we should, in our discretion, be of opinion that there was a miscarriage of justice in convicting the defendant of murder in the first degree, and that a verdict of guilty of murder in the second degree or of manslaughter would have been more consonant with justice, it is now our power and duty so to declare. This is a power which the trial court does not have."

*Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963).

Defence counsel advanced before us in oral argument the novel contention that his tactics, particularly in protracting the trial by such procedures as the claiming of more than 600 exceptions, alienated the jury and caused them to return a conviction of murder in the first degree rather than a lesser crime. He points out that, in a separate jury trial for murder in the first degree, Elaine Soares, who on the record before us can fairly be said to bear about equal culpability with the defendant, was found guilty only of manslaughter. It is not clear whether in this line of argument he is claiming legal error which requires a new trial, or whether he addresses the argument solely to our power to grant relief under § 33E of the statute. From any standpoint we would establish a potentially mischievous precedent if we were to honor the argument. Although defence counsel alone, and not the defendant, appears to have been responsible for the defence tactics here, we should hesitate, in this or most cases, to grant relief on the ground that wilfully irksome defence tactics may have harmed the defendant. The argument that the accomplice was convicted only of the lesser crime is not material, since that verdict was returned by a different jury and may have been based upon, as far as we know, proof which was substantially different from that in the case before us.

Nevertheless, we conclude that the entry of a verdict of guilty of murder in the second degree will be consonant with justice here. Regard for the public interest impels us to use with restraint our power under § 33E to modify the jury's verdict. On the other hand it is clear that in all cases our obligations under § 33E require the most serious deliberation. The seriousness of our obligations in this case is shown by the fact that conviction of murder in the first degree requires confinement for the rest of her natural life, whereas a conviction of murder in the second degree will make her eligible for parole after fifteen years.

The weight of the evidence here indicates murder in the second degree, rather than murder in the first degree or, indeed, manslaughter. We have ruled above that the jury were

warranted in concluding that the murder was in the first degree on any one of the three permissible premises submitted to them in the judge's charge: deliberately premeditated homicide, homicide committed with extreme cruelty and atrocity, or homicide connected with a crime punishable by death or life imprisonment. However, the thrust of the evidence was that the two women intended to steal surreptitiously, not by violence as in a robbery. They reacted with violence only when they were discovered in the act of the theft, which the deceased tried violently to thwart. The entire sequence reflects spontaneity rather than premeditation. They carried no weapon to the motel room. The victim was killed by the use either of an article of clothing or an ornamental chain which he wore around his neck. In a rapid sequence of events, and undoubtedly in fear of arrest by the police, they reacted to quiet their victim. Inferences are warranted that at some instant in the rapid happenings the defendant's intent veered from larceny to robbery, and that for a fleeting period of time she intended to kill the victim. Nevertheless, in our view, her criminal involvement was not of the nature that judges and juries, in weighing evidence, ordinarily equate with murder in the first degree.

4.   The case is remanded to the Superior Court where the verdict of guilty of murder in the first degree and the sentence previously imposed are to be vacated. A verdict of guilty of murder in the second degree is to be entered and sentence is to be imposed thereon.

*So ordered.*