COMMONWEALTH vs. LANNY STEED SCOTT.

Hampden. October 2, 2012. - February 8, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Assault and Battery. Practice, Criminal,* Required finding. *Evidence,* Medical record, Expert opinion. *Witness,* Expert. *Words,* "Impairment."

Discussion of the meaning of the term "impairment" in the context of assault and battery causing serious bodily injury, G. L. c. 265, § 13A (*b*) (i). [357-360]

At the trial of an indictment charging assault and battery causing serious bodily injury, G. L. c. 265, § 13A (*b*) (i), the evidence was insufficient to sustain the defendant's conviction, where the element of serious bodily injury was not established, in that the jury could not, without speculation, have found from the evidence presented (i.e., medical records containing technical terminology unaccompanied by expert testimony) that the nature and extent of the injury to the victim's liver was serious enough that it had a significant effect on the structure and function of her liver. [360-364]

INDICTMENT found and returned in the Superior Court Department on January 17, 2007.

The case was tried before *Peter A. Velis,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Michael J. Fellows* for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

DUFFLY, J. Based on the confinement of and physical assault on his girl friend in her apartment, the defendant was convicted by a Superior Court jury of kidnapping, G. L. c. 265, § 26; assault by means of a dangerous weapon, G. L. c. 265, § 15B (*b*); assault and battery causing serious bodily injury, G. L. c. 265, § 13A (*b*) (i); assault and battery, G. L. c. 265, § 13A (*a*); and malicious destruction of property, G. L. c. 266, § 127. The defendant appealed, and the Appeals Court affirmed his convictions in an unpublished memorandum and order pursuant to its

rule 1:28. *Commonwealth* v. *Scott*, 78 Mass. App. Ct. 1123 (2011). We granted the defendant's application for further appellate review, limiting our review to the defendant's conviction of assault and battery causing serious bodily injury.

The sole issue before us is whether the evidence was sufficient to establish "serious bodily injury" within the meaning of G. L. c. 265, § 13A (*b*) (i) (statute).[1] Because we conclude that the evidence, which consisted primarily of medical records not explained by any expert witness, would not have permitted a rational jury to find that the victim suffered "serious bodily injury" resulting in "impairment of" an organ, the defendant's conviction of assault and battery causing serious bodily injury cannot stand.

*Background.* The jury could have found the following. In October, 2006, the victim and the defendant, who had two children, were no longer living together, but continued to maintain regular contact. On October 23, 2006, at approximately 11:30 P.M., the defendant knocked on the victim's door and she let him into the apartment. The defendant accused her of being involved with another man. When the victim admitted as much, the defendant punched her in the face and the victim fell to the floor. He picked her up, and they moved into the bedroom where they sat side by side on the bed. The defendant was "working himself up" as he sat on the bed; he then leaned over and punched the victim in the middle of her stomach.

Throughout that night and into the next day, the defendant refused to let the victim leave the apartment. Although the defendant periodically calmed down, and he and the victim spent some of the time lying next to each other on the bed, at various points over the course of twelve hours, the defendant punched the victim in the eye, hit her in the face with a can of soda, punched her in the stomach a second time, dragged her,

---

[1]Section 13A of G. L. c. 265 provides, in relevant part:

"(*b*) Whoever commits an assault or an assault and battery: (i) upon another and by such assault and battery causes serious bodily injury . . . . shall be punished . . . . (*c*) For the purposes of this section, 'serious bodily injury' shall mean bodily injury that results in a permanent disfigurement, loss or impairment of a bodily function, limb or organ, or a substantial risk of death."

and threatened her with a knife. When police arrived at the apartment in response to a 911 call, the defendant fled. The victim was taken to a hospital and evaluated. According to medical records admitted in evidence, the victim was diagnosed as having a "grade II" laceration of her liver.

*Prior proceedings.* The Commonwealth's theory at trial was that the two punches the defendant delivered to the victim's stomach resulted in a laceration of her liver, which constituted a serious bodily injury because her liver (an organ) was impaired. The defendant's motions for a required finding of not guilty at the close of the Commonwealth's case and at the close of all the evidence were denied. The jury found the defendant guilty of all charges.

*Discussion.* 1. *The statute.* General Laws c. 265, § 13A (*b*) (i), sets forth an enhanced penalty for the commission of an assault and battery causing "serious bodily injury," defined as "bodily injury that results in a permanent disfigurement, loss or impairment of a bodily function, limb or organ, or a substantial risk of death." G. L. c. 265, § 13A (*c*). See note 1, *supra.* The issue is whether the injury to the victim's liver qualifies as a "serious bodily injury." We read the statute as setting forth three distinct routes for establishing serious bodily injury. The Commonwealth may prove that a defendant caused bodily injury that resulted either in (1) a permanent disfigurement; (2) loss or impairment of a bodily function, limb, or organ; or (3) a substantial risk of death.[2]

2. *Impairment of an organ.* Here, only the second prong of the statute, impairment of an organ, is implicated. The Commonwealth sought to establish that the defendant caused serious bodily injury to the victim when he punched her in the stomach, resulting in the impairment of an organ, her liver. Whether a

[2]The Commonwealth argues, and the defendant concedes, that the Commonwealth was not obligated to prove permanent loss or impairment of the victim's liver, but only that the victim suffered the loss or impairment of that organ. We agree that the word "permanent" must sensibly be read to modify only the term "disfigurement," rather than each word in the phrase "disfigurement, loss or impairment." See *Commonwealth* v. *Jean-Pierre*, 65 Mass. App. Ct. 162, 163 (2005) (each noun phrase in statute must be read as "parallel, independent expression[]"). See also *Commonwealth* v. *Baro*, 73 Mass. App. Ct. 218, 220 (2008) (discussing identical definition in G. L. c. 265, § 15A [*d*]).

rational jury could have found that the victim's liver was impaired requires that we determine the meaning of the term "impairment" in the context of the statute.

We interpret statutory language to give "effect consistent with its plain meaning and in light of the aim of the Legislature" unless to do so would achieve an "absurd" or "illogical" result. *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001). *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996). "Words and phrases shall be construed according to the common and approved usage of the language." *Opinion of the Justices*, 313 Mass. 779, 781-782 (1943). However, the construction of a word or phrase may vary from its plain meaning when such a meaning would "involve a construction inconsistent with the manifest intent of the law-making body or repugnant to the context of the same statute." *Id.* at 782. Technical terms or those that have acquired a particular meaning within the law should be read in a manner that is consistent with that meaning. *Id.*

When the Legislature enacted G. L. c. 265, § 13A, using "impairment" to define a class of "serious" injuries, it employed a term that appears in a variety of legal contexts and whose meaning in the statute could therefore be viewed as ambiguous.[3] It is apparent from the language of the statute as a whole, however, that "impairment" as used in G. L. c. 265, § 13A (*b*) (i), draws its meaning from the medical context, where definitions emphasize an injury's impact on the structure of a part of the victim's anatomy and its ability to serve its usual role in the body. See Stedman's Medical Dictionary 956 (28th ed. 2006) (World Health Organization defines "impairment" as "any loss or abnormality of psychological, physiologic, or anatomic structure or function"). See also American Medical Association, Guides to the Evaluation of Permanent Impairment 5 (6th ed.

---

[3]The American Heritage Dictionary takes an approach straddling contexts in the following definition of "impair": "[t]o cause to diminish, as in strength, value, or quality." American Heritage Dictionary 878 (4th ed. 2006). Black's Law Dictionary defines "impairment" with reference to property and contract law: "The fact or state of being damaged, weakened, or diminished, [e.g.,] impairment of collateral"; whereas "severe impairment" is defined in the context of Social Security or disability law as "a physical or mental impairment that greatly restricts a person's ability to perform ordinary, necessary tasks of daily life." Black's Law Dictionary 819 (9th ed. 2009).

2008) (defining "impairment" as "a significant deviation, loss, or loss of use of any body structure or body function in an individual with a health condition, disorder, or disease"). An impairment of an organ, therefore, occurs when damage to the structure of the organ is significant enough to compromise its ability to perform its function in the victim's body. Likewise, impairment of a limb occurs when, because of significant damage to its structure, its capacity to perform its usual function is compromised. An impairment of a bodily function arises when a part or system of the body (other than an organ or limb) is significantly impeded in its ability to fulfil its role.[4]

The degree of "impairment" contemplated by the statute is best understood when considered with the neighboring word in the same phrase, "loss," as well as the words in the other two clauses, "permanent disfigurement" and "substantial risk of death." See *Commonwealth* v. *Brooks*, 366 Mass. 423, 428 (1974) ("words in a statute must be considered in light of the other words surrounding them"); *Commonwealth* v. *John T. Connor Co.*, 222 Mass. 299, 302 (1915) ("the scope of doubtful words may be ascertained by reference to the operation of other associated words"). The loss of a limb, organ, or bodily function would have a substantial impact on a victim on a par with injuries causing permanent disfigurement or risking death. See *Selectmen of Topsfield* v. *State Racing Comm'n*, 324 Mass. 309, 313 (1949) ("if reasonably possible, all parts shall be construed as consistent with each other so as to form a harmonious enactment effectual to accomplish its manifest purpose"). These conditions connote significant effects on the body.

We therefore reject the standard urged by the Commonwealth, that any injury will constitute an "impairment" under G. L. c. 265, § 13A, if it is "more than merely transient and trifling." See *Commonwealth* v. *Lord*, 55 Mass. App. Ct. 265, 269 n.7 (2002), quoting *Commonwealth* v. *Farrell*, 322 Mass. 606, 621 (1948). See, e.g., *Commonwealth* v. *Baro*, 73 Mass. App. Ct.

---

[4]Although an injury to an organ might have an impact on organ function, and therefore constitute both impairment of that organ and impairment of a bodily function, the two elements are not entirely duplicative. By way of example, the Commonwealth might show that damage to parts of the body that are not organs, or less significant damage to multiple organs, had a serious impact on a bodily function.

218, 219 (2008) (serious bodily injury where victim suffered fractured bones on side of face, "orbital blow out fracture," bleeding within sinuses and nasal cavity, and loss of sight in right eye for one and one-half months); *Commonwealth* v. *Jean-Pierre*, 65 Mass. App. Ct. 162, 162-163 (2005) (impaired bodily function where punch broke victim's jaw and required victim to be fed through tube for six weeks).

3. *Sufficiency of the evidence.* We next address whether the evidence was sufficient to establish serious bodily injury, that is, injury resulting in the impairment of the victim's liver. We conclude that because the jury could not, without speculation, have found from the evidence presented that the nature and extent of the injury to the victim's liver was serious enough that it had a significant effect on the structure and function of her liver, the element of serious bodily injury was not established.

In reviewing the denial of a motion for a required finding of not guilty, we consider whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979). We view the evidence, and all permissible inferences drawn from that evidence, in the light most favorable to the Commonwealth. *Commonwealth* v. *Cordle*, 412 Mass. 172, 175 (1992). "The evidence must allow[] us to do more than find that there was some record evidence, however slight, to support each essential element of the offense. Nor will the evidence be sufficient if it relies on conjecture or speculation, or if it tends equally to support either of two inconsistent propositions" (citations omitted). *Commonwealth* v. *Rodriguez*, 456 Mass. 578, 582 (2010).

The victim's medical records were introduced in evidence. However, there was no testimony from any medical expert explaining the content of those records or describing the nature and extent of the victim's injuries.[5] The victim's testimony provided little evidence regarding the impact of the injury to

[5]Expert testimony is admissible when it will "help jurors interpret evidence that lies outside of common experience." *Commonwealth* v. *Tanner*, 45 Mass. App. Ct. 576, 581 (1998). See Mass. G. Evid. § 702 (2012).

her liver.[6] She said that, following the attack, she was in pain, and her father drove her to a hospital. In response to a question from defense counsel, the victim agreed that she remained in the hospital from October 24 through October 27, 2006, "for observation," and had "no surgery or any other process done." She said she was given "mainly just pain killers."

As concerns her liver, the victim's medical records[7] reflect "[c]linical [d]iagnoses" of "laceration of liver, minor, without mention of open wound into cavity." During her hospital stay, the victim underwent evaluative procedures, including computed tomography (CT) scans of her jaw, face, pelvis, and abdomen. With respect to the results of the abdominal scan, the records state:

> "In the medial segment of the left hepatic lobe there is a somewhat linear and somewhat branching area of diminished attenuation extending from the region of the hepatic surface and extending towards but not quite reaching left portal vein. This is new compared to the prior examination and likely represents an hepatic laceration. There is a small amount of . . . free fluid in the gallbladder fossa. There is a small amount of free fluid in the pelvis as well. The pancreas, spleen, adrenal glands, and bilateral kidneys are normal without evidence for traumatic injury. Limited evaluation of the unspecified stomach, small bowel, and colon is unremarkable as well. The uterus is grossly normal. There is no free air within the abdomen. The osseous structures are unremarkable. IMPRESSION: Grade II hepatic laceration in the medial segment of the left hepatic lobe. There is a small amount of fluid in the gallbladder fossa which may represent blood. There is also a small amount of free fluid in the pelvis."

---

[6]The judge struck the victim's statement, "[T]he reason I was there is my liver was lacerated." As the judge correctly recognized, the victim was not qualified to testify to her diagnosis; evidence of a diagnosis could have been provided only through a medical expert.

[7]The records are confusing in a number of respects. For example, it appears that sixteen pages labeled "order summary," listing medication and testing orders, were printed twice, once using twenty-four-hour clock times and once with twelve-hour clock times. Handwritten "progress notes" are of varying legibility. The clearest, most comprehensible medical assessment is contained in the hospital's discharge summary, on which we primarily rely for our description of the injury to the victim's liver.

The medical records also contain the notation that the victim experienced "diffuse pain head to toe, most severely in upper abdomen." She was given pain medication for pain ranging from mild to severe, but she otherwise received only diagnostic, rather than treatment-related, medical procedures. The victim was discharged on October 27 with a prescription for pain medication; she was told to avoid heavy lifting and strenuous exercise and to schedule a follow-up appointment.

Beyond the diagnosis "grade II hepatic laceration" — which, based on the reference to "laceration of the liver" elsewhere in the report, the jury could have understood to mean a "grade II" laceration of her liver — the medical records contain no information explaining the relative severity of a "grade II" laceration. They do not describe the impact or effect of such a laceration on the victim's liver and its ability to perform its function in the victim's body. So far as we are able to discern without the aid of medical expertise, the medical records do not indicate how any injury affected the liver's ability to fulfil its functional role. The records reflect that the victim was ambulatory, neurologically oriented, and able to care for and feed herself. They provide no explanation as to why she remained in the hospital for three nights; the only evidence in this regard was the victim's testimony that she was there for observation.

The jury are permitted to draw reasonable inferences from the evidence; they are not permitted to engage in speculation or conjecture as to the meaning of unexplained technical phrases and notations. See *Commonwealth* v. *Kirkpatrick*, 423 Mass. 436, 447, cert. denied, 519 U.S. 1015 (1996), overruled on other grounds, *Commonwealth* v. *King*, 445 Mass. 217 (2005), cert. denied, 546 U.S. 1216 (1996). In the *Kirkpatrick* case, a defendant charged with sexual abuse of a child sought to introduce medical records showing that, during the relevant period, he was treated for two sexually transmitted infections, while the victim tested negative for the same infections. *Id.* We determined that the records were excluded properly because no medical testimony was introduced and, in the absence of such expert testimony, the records would have required speculation both as to the likelihood that the infections would have been transmitted and as to the reliability of the tests on a child. *Id.* at

447-448. Cf. *Buck's Case*, 342 Mass. 766, 769 (1961) (where causal connection between inhalation of formaldehyde and death was beyond "common knowledge and experience of the ordinary layman," medical testimony was required).

Here, the jury were presented with records that reflected the information that the victim had a "grade II" liver laceration and "free fluid" in the gallbladder and pelvis. Even assuming that a juror would have understood there to be some relationship between the liver and gallbladder, such a juror could not from those unadorned and unexplained entries have arrived at any conclusion about the impairment of the liver based on the presence of free fluid in the gallbladder and pelvis. Nor were the relative severity and effect of various gradations of liver laceration explained, such that it would be reasonable to infer that a "grade II" laceration of the liver is of sufficient severity as to constitute an impairment of that organ under the statute.[8]

The Commonwealth urges that, even without diagnosis of a "grade II" liver laceration, circumstantial evidence could have led a reasonable juror to conclude that the victim suffered an impairment of her liver. The Commonwealth points to evidence in the medical records that the victim at times experienced severe abdominal pain, was treated with pain medication, was unable to stand by herself during CT scans, and was hospitalized for several days. But the presence of pain or tenderness in the area of an injured organ is insufficient, without any explanation as to the source of the pain and its implications, to establish impairment under the statute.

We recognize that the victim suffered a traumatic series of assaults resulting in injuries to her face, eye, neck, and skin. It may well be the case that the laceration to her liver resulted in a sufficiently serious injury to have constituted an impairment of

---

[8]Excerpts from medical texts and articles about liver "blunt hepatic injury" were included in the record on appeal but were not part of the record below. The Commonwealth has not sought their exclusion from the record; indeed, the Commonwealth references these texts in its brief. We note that, according to these texts, a "grade II" liver laceration is at the lower end of a five-point scale. Without this information properly before them, and even assuming that a juror would understand the meaning of the term "laceration," the jury would have had to engage in unguided speculation in assigning a relative level of severity to the liver injury.

her liver. However, the jury could not have reached that conclusion based on information that was within the ordinary, common experience of a reasonable juror. While medical testimony may not be required in every instance to establish that a victim has suffered serious injury resulting in impairment to an organ,[9] the Commonwealth bears the burden of establishing the severity of an injury through its impact on the structure of the victim's organ and its consequent effect on the ability of the organ to perform its usual function. Medical records containing technical terminology that require jurors to speculate on the meaning of key terms will be insufficient, without more, to meet this burden.

*Conclusion.* For the reasons set forth above, we conclude that the judge erred in denying the defendant's motion for a required finding of not guilty on the indictment charging assault and battery causing serious bodily injury. The judgment of conviction of assault and battery causing serious bodily injury is reversed, the verdict is set aside, and judgment shall enter for the defendant. The case is remanded to the Superior Court for resentencing on the remaining convictions.

*So ordered.*

---

[9]In those rare instances where issues of injury and causation are "within general human knowledge and experience," an expert may not be necessary. See *Pitts* v. *Wingate at Brighton, Inc.*, 82 Mass. App. Ct. 285, 290 (2012), and cases cited. See, e.g., *Mitchell* v. *State*, 238 Ga. 167, 167 (1977) (expert not required in aggravated battery case to prove loss of use of eye, where victim testified to loss of eyesight); *Valentine* v. *State*, 257 Ind. 197, 201 (1971) (medical expert not needed to establish whether defendant's acts could cause "loss of health, life or limb" where police witness testified that .38 caliber slug was removed surgically from victim's left temple). Cf. *Coshatt* v. *State*, 744 S.W.2d 633, 636 (Tex. Ct. App. 1987) (medical testimony was unnecessary to establish "protracted impairment" of back where victim testified that she lost partial use of her back following assault, and medical records instructed victim to remain "predominately at bed rest with the back extended and only being up for brief periods of time for at least six weeks" and to avoid "heavy work or other activities" for up to three months).