NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12100


COMMONWEALTH  vs.  JULIE A. COREY.



Worcester.      December 8, 2023. – March 18, 2024.

Present:  Budd, C.J., Gaziano, Kafker, & Georges, JJ.



Homicide.  Practice, Criminal, Assistance of counsel, Motion for a
     required finding, Appeal by Commonwealth, Psychiatric
     examination, Capital case.  Cellular Telephone.  Felony-Murder
     Rule.  Kidnapping.  Evidence, Expert opinion, Inference.




Indictment found and returned in the Superior Court
Department on December 17, 2009.

The case was tried before Janet Kenton-Walker, J., and a
motion for a new trial, filed on February 8, 2019, was heard by
her.


Janet Hetherwick Pumphrey for the defendant.
Ellyn H. Lazar, Assistant District Attorney, for the
Commonwealth.


KAFKER, J.  The defendant, Julie A. Corey, was convicted of

murder in the first degree on theories of deliberate

premeditation, extreme atrocity or cruelty, and felony-murder

with a predicate felony of aggravated kidnapping in violation of

G. L. c. 265, § 26.  Following her conviction, the defendant

filed a motion for a new trial, arguing that she received

ineffective assistance of counsel because trial counsel failed

to call a cell phone expert to testify about her location on the

night of the murder.[1]  Her motion also included a request that

the motion judge enter a required finding of not guilty.  The

motion judge, who was also the trial judge, denied the

defendant's motion for a new trial.  The judge, however, vacated

the defendant's conviction of murder in the first degree on a

theory of felony-murder after finding that the evidence was

insufficient to prove the defendant committed the predicate

felony of aggravated kidnapping.

The defendant now appeals from the denial of her motion for

a new trial, again raising the argument that she received

ineffective assistance of counsel because trial counsel failed

to call a cell phone expert.  The defendant also requests that

we exercise our powers pursuant to G. L. c. 278, § 33E (§ 33E),

to reduce her conviction.  The Commonwealth, in turn, appeals

from the judge's order vacating the defendant's felony-murder

conviction.  We disagree with the defendant that she received

---

[1] The defendant also argued that she received ineffective assistance of counsel because trial counsel failed to call a psychiatric expert to testify about her alleged postpartum depression at the time of the murder.  She does not raise this specific claim of ineffective assistance on appeal.

ineffective assistance of counsel. Trial counsel's decision not to call a cell phone expert was not ineffective, nor would it have likely influenced the jury's conclusions. Additionally, we agree with the Commonwealth that there was sufficient evidence to find the defendant guilty of felony-murder with a predicate felony of aggravated kidnapping, and so we reinstate that conviction. Finally, after reviewing the entire record, we find no basis upon which to reduce the defendant's conviction and therefore decline to exercise our § 33E powers.

1. Background. We recite the facts as the jury could have found them, reserving some details for later discussion.

a. The Commonwealth's case. On July 27, 2009, the landlord of an apartment building on Southgate Street in Worcester (Southgate) entered the apartment of Darlene Haynes (victim), in response to concerns about the victim's pets. Upon entering, he perceived a "[v]ery foul" smell. He went into the victim's bedroom, walked over to the closet, and pulled on a blanket. A leg fell out. The body was later identified as the victim's. An autopsy of the victim revealed blunt force trauma to her head, an electrical cord wrapped twice around her neck causing strangulation, a nine-inch incision of her abdomen, and missing reproductive organs. The victim was pregnant at the time she was killed, due anytime.

The victim and the defendant had briefly been neighbors at Southgate, where the defendant resided with her boyfriend, Alex Dion. The defendant and Dion dated on and off for about two years. In the spring of 2008, the defendant and Dion broke up. They got back together when the defendant became pregnant. During their relationship, the defendant was jealous and frequently accused Dion of cheating on her. Sometime in 2008, while they were living at Southgate, the defendant had a miscarriage. Soon afterwards, the defendant and Dion again broke up and then moved out of Southgate.

In February of 2009, the defendant and Dion resumed communications. The defendant told him that she was once again pregnant with his baby -- a girl -- and was due on June 20. After getting back together, Dion and the defendant were frequently fighting about whether she was or was not pregnant, with the defendant trying to convince Dion by showing him pregnancy tests and having him listen to a baby monitor. The defendant, however, would not let Dion attend doctor's appointments with her. On April 13, 2009, the defendant was taken to the hospital complaining of pain. Dion was asked to leave the defendant's hospital room. Medical records from the visit indicated that the defendant was thirty weeks pregnant and that there was good fetal activity. The defendant told the doctor that she was in a fight with her boyfriend and that she

was afraid he would return to his wife.  She eventually left the hospital against medical advice.

The defendant's due date came and went.  When June 20 passed, she told Dion that her due date was instead July 2. When July 2 passed, the defendant told Dion she was due on July 4.  When that date also passed, she told Dion she was scheduled for a cesarean section but was then "bumped off the list." Eventually, she told Dion her cesarean section was scheduled for July 24.  The defendant similarly gave friends and family changing due dates.

On July 23, the defendant and Dion were together at home, which was then the house of Dion's uncle, Kevin Dion.  The two had prepared for the defendant's cesarean section the next day, packing Dion's car with an overnight bag.  In the afternoon, the defendant left, telling Dion that she was going to a friend's house.  She later called Dion and told him she planned to give the victim a ride to the store.  Dion found this odd because, as he and another witness testified, the defendant and the victim were not friends.  The victim's landlord saw the victim getting into a car with the defendant in the afternoon, around 3:30 P.M. That evening, the defendant returned home, but left again to visit an unidentified friend.  At around 8 P.M., the victim was seen at a package store near Southgate, with Dion's car in the parking lot.

Between 8:45 P.M. and 11:20 P.M., the victim sent text messages to her friend, saying that another friend was coming over to spend the night. In one text message, the victim said that she was going to have a wine cooler. In the final text message sent at 11:20 P.M., the victim said "[g]ood night."

Meanwhile, at around 10 P.M., the defendant began calling Dion to tell him she was having stomach pains. Around 11:30 P.M., she called Dion to say that her water had broken and that a friend was going to take her to a hospital in Framingham. One or two hours later, she told him that she had a baby girl. The defendant was calling Dion frequently throughout the night on his uncle's telephone. During these telephone calls, the defendant complained about the hospital, expressing frustration with the way doctors were treating her and the baby, and telling Dion she planned to leave against medical advice. Telephone records for the uncle's telephone number suggested that the defendant called twelve times. At one point, Dion received a call on his uncle's telephone from the victim's cell phone number. Dion testified that the victim had never before called him.

On July 24 from 2 A.M. to 2:30 A.M., neighbors across the hall from the victim's apartment heard banging noises coming from the apartment. It sounded like someone was picking up furniture and moving it around. From 3 A.M. to 4 A.M., they

heard water running on and off in the victim's apartment. They did not go to the victim's apartment or contact anyone.

Between 7 A.M. and 8 A.M. on July 24, the defendant arrived home with a baby. The defendant was wearing a new set of clothes. Dion noticed that the baby had dried blood in the creases of her arms and neck, and around her ears. He also noticed that the umbilical cord did not have a plastic clip like the hospital typically provided but was instead tied off with a string. When Dion asked the defendant about the string, the defendant said she had asked the doctor to take the plastic clip off because it was too heavy.

The defendant began telling others she had a baby and introducing the baby to them. She called her best friend and told her. She invited a neighbor over to see the baby. The neighbor also noted blood on the baby and the string tied around her umbilical cord. The neighbor took the defendant and Dion to the store to buy formula because the two had no money. Others also saw the defendant with the baby on July 24, making note of the baby's small size, of the string tied around the umbilical cord, and that the baby was very cold.

On July 26, the defendant and Dion moved to New Hampshire, where the defendant's father resided. They packed their possessions and put them in Dion's car. When the two arrived at the defendant's father's house, however, they were told they

could not stay. They were given money for a motel and the next day sought assistance from a welfare office in New Hampshire. The defendant had been receiving benefits due to her pregnancy. She told a case technician with the welfare office that she had little money but could not work. When the case technician asked for a birth certificate or crib card for the baby, the defendant said she did not have either. The defendant and Dion eventually found a shelter where they could stay.

At various points during their time in New Hampshire, the defendant became distressed about the baby. At a doctor's visit, the defendant became aggravated when the doctor asked to take a picture of the baby. She abruptly left with the baby before the doctor could return with the camera. While discussing the doctor's appointment at the shelter, the defendant leaned against a wall and said, "Nobody's taking this child away from me."

Later investigation revealed that the baby in the defendant's care was not hers, but the biological child of the victim and the victim's boyfriend, Roberto Rodriguez. A review of hospitals in Framingham and Natick produced no records of the defendant delivering a baby. In Dion's car, investigators found a falsified birth certificate for the baby, listing Dion and the defendant as her parents and a birthplace of Framingham. Police also found a document from the defendant's health center,

stating that she would receive benefits during her pregnancy and that she would need to reapply for benefits after her delivery. Other documents from the Massachusetts Department of Transitional Assistance were found in the car, including a document requesting that the defendant attend a scheduled appointment and bring the baby's birth certificate and stating that, if she did not do so, she could lose her benefits.

Back in Massachusetts, law enforcement began investigating and documenting the victim's apartment. In the bedroom where the victim's body was found, red-brown stains saturated both sides of the mattress on the bed. Red-brown stains were found on other items in the bedroom and in the kitchen. Investigators also found a "Smirnoff" bottle in the living room. When tested for the presence of deoxyribonucleic acid (DNA), the defendant matched the major profile. Another "Smirnoff" bottle was found in the victim's bedroom. The defendant's fingerprint was discovered on the bottle.

At trial, the Commonwealth alleged that by July 23 the defendant had lost her own baby and was distraught. The Commonwealth contended that the defendant was concerned Dion would leave her if she did not have a baby and that she would lose her benefits. The Commonwealth argued that the defendant, seeking a solution for her problems, decided to kill the victim and take the victim's baby as her own.

b.  The defendant's case.  At trial, the defendant vigorously argued that, even if she took the baby, she did not kill the victim.  The defendant argued that it would not be possible for her to commit the murder, clean up the victim's apartment, dispose of the evidence, and take care of the baby, all while repeatedly calling Dion.

Rather, the defendant argued that Rodriguez, the victim's boyfriend and the father of the baby, committed the murder because he was angry with the victim and no longer wished to be in a relationship with her.  The defense suggested that Rodriguez, after murdering the victim, saved his baby and then gave her to the defendant.  The defendant further argued that law enforcement's investigation of the murder, including Rodriguez's involvement, was inadequate (a so-called Bowden[2] defense).

As part of these defenses, the defendant introduced evidence that Rodriguez had previously been violent toward the victim, allegedly kicking her in the stomach and pushing her into a glass coffee table.  This altercation resulted in the victim obtaining a restraining order against Rodriguez.  The defense also called a former girlfriend of Rodriguez, who testified about an incident where Rodriguez became jealous and

---

[2] Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).

angry, grabbing her by the neck and pulling her into another room.  She testified that Rodriguez then grabbed a belt, wrapped it around her neck, and proceeded to choke her.  He allegedly told her that he was going to hang her and that it would only hurt for "a second."  The altercation only ended when the telephone rang and Rodriguez left the room to answer it.  In closing argument, the defendant argued that Rodriguez's actions toward both the ex-girlfriend and the victim demonstrated a pattern of violence consistent with the murder.

The defendant presented additional evidence allegedly connecting Rodriguez to the murder.  The jury heard testimony that a first-aid kit taken from the victim's apartment contained DNA from both Rodriguez and the baby.  The jury also heard the testimony of an individual who saw Rodriguez on July 24 walking "from the direction of the [nearby] cemetery."  The witness attempted to say hello to Rodriguez, but Rodriguez rushed away.  Rodriguez appeared disgruntled, dirty, and sweaty.  The defendant, in closing argument, suggested that Rodriguez could have buried missing evidence, including the victim's reproductive organs, at the cemetery.  Finally, the jury heard evidence that, during his first interview with the police following the discovery of the victim's body, Rodriguez did not inquire whether the baby had survived.

Arguing that law enforcement failed to adequately investigate the murder, the defendant introduced evidence that the police learned people were present in the victim's apartment between July 23 and the day her body was discovered.[3] The defendant called a detective to discuss a statement from the victim's neighbor. The neighbor told police that on the evening of July 23, she saw the victim and the defendant smoking on the back porch with an unknown male. The male was described as white, roughly six feet tall, having tattoos, and wearing a white "wife beater" T-shirt. When shown a photographic array, the neighbor picked out a photograph of William Daviau, a friend and former roommate of the victim and Rodriguez. The neighbor also told the detective that around 4:45 A.M. on July 24, she saw someone crawling through the window of the victim's apartment who she believed was Daviau. The detective subsequently interviewed Daviau about his whereabouts on July 23 and 24. Daviau stated that he was in a "drug rehab facility," where he was obligated to stay at night. Neither the detective nor -- to his knowledge -- any other officer checked Daviau's alibi.

---

[3] The evidence was introduced not for the truth of the matter, but to demonstrate what was known by law enforcement, pursuant to Bowden. See Commonwealth v. Silva-Santiago, 453 Mass. 782, 802 (2009).

Another neighbor of the victim testified that on the night of July 24, she saw an individual in the victim's apartment. She recognized him as the friend of people who lived downstairs and thought his name was "Tim." When Tim noticed the neighbor looking, he pulled down the blinds. Later, on July 26, the same neighbor saw a person climbing into the victim's window from the front porch. She heard water being dumped over the porch. When she went to investigate, she saw Tim standing in front of another person who was trying to hide his or her face. The two were returning from the porch, with Tim carrying a fish tank. The neighbor mentioned that the victim had promised her a table. When the neighbor and her friend tried to enter the victim's apartment to get the table, Tim would not let them enter. The jury later learned that Tim was Timothy Tripp, a friend of Rodriguez. Tripp testified that on the night of July 26, he went to the victim's apartment to obtain a fish tank that Rodriguez had promised him. He stated that he only remained in the apartment long enough to retrieve the fish tank. Tripp did not remember if the police ever inspected the fish tank.

The defendant also argued that law enforcement failed to adequately search for evidence. Law enforcement did not search the cemetery from which Rodriguez was seen walking. After finding a debit card belonging to Rodriguez in the victim's apartment, an officer testified that he was not aware of anyone

in law enforcement analyzing the card's transactions to determine whether it was recently left there. Neither Rodriguez's apartment nor his car was searched. The defense also elicited testimony that law enforcement did not test a number of items found in the victim's apartment for fingerprints. Although the victim was found with an electrical cord wrapped around her neck, the police did not test a lamp with a missing electrical cord for fingerprints.

In closing argument, trial counsel suggested that law enforcement "left a lot of stones unturned." Based on this argument, trial counsel successfully sought jury instructions as to both third-party culprit and Bowden defenses. The jury were instructed that they could consider law enforcement's failure to investigate leads or perform tests in evaluating the defendant's guilt or innocence. The jury were also told that they may substantively consider evidence about Rodriguez in evaluating whether another person committed the murder.

c. Verdict. After hearing all the evidence, the jury convicted the defendant of murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder.

2. Discussion. a. Ineffective assistance of counsel. The defendant contends that the judge erred in denying her motion for a new trial because she received ineffective

assistance of counsel when trial counsel failed to call a cell phone expert to testify at trial.  Specifically, the defendant alleges that an expert would have testified that the defendant was traveling throughout Worcester on the night of the killing and was rarely connected to cell towers near Southgate.  She argues this evidence would have demonstrated to the jury that she could not have committed the murder and then cleaned up afterwards.

In support of her motion for a new trial, the defendant submitted an affidavit by a cell phone expert retained postconviction.  In the affidavit, the defendant's expert described his review of the defendant's cell site location information (CSLI) records from July 23, 2009, at 7 A.M. to July 24, 2009, at 6 A.M.  The expert stated that there were two cell towers near Southgate to which the defendant's cell phone connected during this period:  one near Holy Cross College (Holy Cross tower) and one near Main Street (Main Street tower).  According to the expert, the defendant's cell phone connected to the Holy Cross tower on July 23 at 1:30 P.M. and then 8:59 P.M.  The defendant's cell phone connected to the Main Street tower at 7:49 P.M. that same day.  The defense expert also noted that the defendant's cell phone connected to a tower on the other side of Interstate Route 290 (Oak Hill tower) from Southgate on July 23 at 10:42 P.M. and on July 24 at 4:06 A.M.  Finally, the expert

explained that there were no records in the early morning of July 24, meaning that it was "impossible" to know where the cell phone was located at the time.

In opposition to the defendant's motion for a new trial, the Commonwealth filed an affidavit by its own expert about the CSLI data and the analysis of the defendant's expert. The Commonwealth's expert agreed that there was no location data on July 24 from approximately 12 $\underline{A}$.$\underline{M}$. to 2 $\underline{A}$.$\underline{M}$. or from approximately 4 $\underline{A}$.$\underline{M}$. to 6 $\underline{A}$.$\underline{M}$., and that it was therefore impossible to know where the defendant's cell phone was located during these hours. The Commonwealth's expert, however, disagreed about connections to the Holy Cross tower, finding additional connection times on July 23 at 8:24 $\underline{P}$.$\underline{M}$., 8:58 $\underline{P}$.$\underline{M}$., and 8:50 $\underline{P}$.$\underline{M}$. The Commonwealth's expert also disagreed with the defendant's expert's description of the distance between Southgate and the Oak Hill tower on the other side of Interstate Route 290. According to the Commonwealth's expert, a cell phone does not always connect to the closest cell tower, meaning that the distance of a cell tower is not always determinative of the cell phone's location. He opined that it was possible that the defendant's cell phone was connected to the Oak Hill tower while she was located at Southgate. Finally, the Commonwealth's expert stated that, during a review of the victim's cell phone records, three calls were made on July 24 (at 5:16 $\underline{A}$.$\underline{M}$., 7:25

A.M., and 7:32 A.M.) using the "*67" prefix, which prevents the recipient of the call from viewing the outgoing telephone number. The first call was made to Kevin Dion's telephone and the last two calls were made to the defendant's cell phone.

The defendant also submitted an affidavit from trial counsel. Trial counsel stated that he considered calling a cell phone expert to testify, but decided not to because he believed the third-party culprit and Bowden defenses were so strong. Trial counsel further noted that the defendant, in her affidavit, did not dispute that she was at the victim's apartment on the night of the killing. The judge held an evidentiary hearing limited to the defendant's other claim of ineffective assistance of counsel.[4] See note 1, supra. Although

_____

[4] To the extent that the defendant suggests that the judge was required to hold an evidentiary hearing on the issue of trial counsel's failure to call a cell phone expert, we disagree. A judge may rule on a motion for a new trial without a further evidentiary hearing "if no substantial issue is raised by the motion or affidavits." Commonwealth v. Upton, 484 Mass. 155, 161 (2020), quoting Commonwealth v. Goodreau, 442 Mass. 341, 348 (2004). For an issue to be substantial, "the defendant's submissions need not prove the [motion's] factual premise . . . but they must contain sufficient credible information to cast doubt on the issue" (quotation and citation omitted). Upton, supra at 162. Where the motion judge was also the trial judge, the judge may use his or her "knowledge and evaluation of the evidence at trial" to "consider whether holding a hearing will add anything to the credibility or materiality of the affidavits submitted" (quotation and citations omitted). Id. We discern no abuse of discretion in the judge's decision not to hold an evidentiary hearing on the issue of trial counsel's failure to call a cell phone expert. As discussed supra, the defendant's and the Commonwealth's

trial counsel testified at that hearing, he did not testify about his decision not to call a cell phone expert. Following the hearing, the judge denied the defendant's motion for a new trial, finding that trial counsel's failure to call a cell phone expert was not ineffective assistance.

Absent a constitutional error, we review the denial of a motion for a new trial for an abuse of discretion. Commonwealth v. Kolenovic, 471 Mass. 664, 672 (2015), S.C., 478 Mass. 189 (2017). See Commonwealth v. Upton, 484 Mass. 155, 162 (2020) (abuse of discretion standard applied where judge denied motion for new trial without holding evidentiary hearing). Where the motion judge was also the trial judge, "we give 'special deference' to the judge's findings of fact and the ultimate decision on the motion." Kolenovic, supra at 672-673, quoting Commonwealth v. Lane, 462 Mass. 591, 597 (2012). The judge has the discretion to weigh the credibility and import of affidavits submitted in support of a motion for a new trial. Commonwealth v. Grace, 370 Mass. 746, 751-752 (1976). The judge's findings,

---

experts were largely in agreement. Additionally, the judge oversaw the trial and was thus intimately familiar with the Commonwealth's case and any potential defenses. An evidentiary hearing on this point would add nothing to aid the judge in assessing the strength of the defendant's claim. See Goodreau, supra at 348-349 ("If the theory of the motion, as presented by the papers, is not credible or not persuasive, holding an evidentiary hearing to have the witnesses repeat the same evidence . . . will accomplish nothing").

therefore, will be accepted if supported by the record. Commonwealth v. Walker, 443 Mass. 213, 224 (2005).

When a claim of ineffective assistance of counsel is brought on an appeal from a conviction of murder in the first degree, we first examine whether there has been a "serious failure by trial counsel." Commonwealth v. Tolan, 453 Mass. 634, 645 (2009), quoting Commonwealth v. Harbin, 435 Mass. 654, 656 (2002). We then consider whether that failure resulted in a substantial likelihood of a miscarriage of justice. Tolan, supra. Under this standard, we must ask whether the error "was likely to have influenced the jury's conclusion." Walker, 443 Mass. at 225, quoting Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

Strategic or tactical decisions by trial counsel will only be considered ineffective if they were manifestly unreasonable at the time made. Commonwealth v. Ayala, 481 Mass. 46, 62 (2018). "The decision to call, or not to call, an expert witness fits squarely within the realm of strategic or tactical decisions." Id. at 63. Such a decision is only manifestly unreasonable if it is one that "lawyers of ordinary training and skill in criminal law would not consider competent" (citation omitted). Id. at 62. When assessing trial counsel's decisions, "reasonableness does not demand perfection. . . . Nor is

reasonableness informed by what hindsight may reveal as a superior or better strategy."  Kolenovic, 471 Mass. at 674.

Trial counsel's decision not to call a cell phone expert was not ineffective assistance because the decision was not manifestly unreasonable at the time it was made.  At the time trial counsel decided not to call a cell phone expert, the defendant had viable defenses based on evidence of third-party culprits and law enforcement's failure to investigate.  This evidence was used to show that others were at the victim's apartment at the time of the killing, and that the defendant could not have both committed the murder and cleaned up afterwards.  Trial counsel forcefully argued as much during his closing argument.  An expert may have been able to provide some limited evidence that would help corroborate the defendant's case, but we do not assess trial counsel's decision from the benefit of hindsight.  See Kolenovic, 471 Mass. at 674 (our review "limits the effect of hindsight by requiring a focus on the point in time when counsel made the challenged strategic decision").  Additionally, trial counsel was aware that CSLI records could also corroborate the Commonwealth's case that the defendant was at the victim's apartment.  We cannot say it was manifestly unreasonable for trial counsel to choose not to get into the weeds of the defendant's comings and goings, especially where he believed that the other defenses were more persuasive.

See Ayala, 481 Mass. at 63-65 (not manifestly unreasonable for trial counsel to fail to call eyewitness identification expert where trial counsel "vigorously challenged" identification through other means).  There was no error by trial counsel.

We also conclude that the expert testimony, had it been presented, would not likely have influenced the jury's result.  Contrary to the defendant's contentions, her cell phone expert's affidavit does not prove that she was somewhere else at the time of the murder.  Rather, the expert noted that the defendant's only connections to a cell tower between July 23 at 10:42 P.M. and July 24 at 4:06 A.M. were to the Oak Hill tower, which he suggested was far from Southgate.  But as the Commonwealth's cell phone expert noted, a cell phone does not always connect to the closest tower.  The defendant's expert thus could not have conclusively placed her far from Southgate on the night of the killing.  Additionally, the defendant's expert noted several significant gaps in cell phone activity during those critical hours of the night.  In contrast, the Commonwealth's expert found records of calls placed through the victim's cell phone during these gaps, including a telephone call at 5:16 A.M. on July 24, which Dion claimed was a call from the defendant, not the victim, as the victim had never called him before.  The CSLI records, therefore, weakly supported the defendant's case, while also corroborating parts of the Commonwealth's case.  We cannot

say that in these circumstances the expert's testimony about the defendant's cell phone location would have influenced the jury's conclusion.  See Commonwealth v. Kirkland, 491 Mass. 339, 350-351 (2023) (any error in failing to call barber experts to contradict identifications of defendant based on hairstyle was unlikely to influence jury's conclusion where experts could not conclusively rule out that defendant possessed such hairstyle).  See also Commonwealth v. Moore, 489 Mass. 735, 747-748 (2022) (trial counsel not ineffective for failing to use defendant's CSLI data to cast doubt on testimony placing defendant at killings where data did not conclusively show defendant was elsewhere and was "arguably inculpatory"); Commonwealth v. Gonzalez, 443 Mass. 799, 811 (2005) (trial counsel's failure to call expert to testify that victim's wounds were caused by right-handed assailant was not ineffective where "claim is entirely speculative" and "no evidence or affidavit indicat[es] that an expert could make such a determination").

We therefore hold that trial counsel was not ineffective in failing to call a cell phone expert.  Accordingly, it was not an abuse of discretion for the judge to deny the defendant's motion for a new trial.

b.  Felony-murder conviction.  At trial, the Commonwealth sought to convict the defendant of murder in the first degree under several theories, including felony-murder with a predicate

felony of aggravated kidnapping, in violation of G. L. c. 265, § 26 (§ 26). After significant debate between the parties, the judge instructed the jury on felony-murder and the jury returned a verdict of guilty on this theory.

Following her conviction, the defendant filed a motion for a new trial that included a request for entry of a finding of not guilty pursuant to Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995), without specifying the grounds on which such relief was warranted. The judge allowed the defendant's motion as to the conviction of murder in the first degree on a theory of felony-murder. The judge concluded that the evidence at trial failed to prove that the defendant inflicted serious bodily injury on the baby, as required by § 26. The Commonwealth now appeals.

Our review of the judge's ruling on the motion for a required finding of not guilty is a question of law. See Commonwealth v. Doucette, 408 Mass. 454, 456 (1990). The question before us, as it was for the judge, is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). Id., quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). A conviction may be sufficient where it is based on "circumstantial evidence and inferences drawn

therefrom," so long as the inferences are "reasonable and possible" (citation omitted). Commonwealth v. Trotto, 487 Mass. 708, 716 (2021). Although inferences "need not be necessary or inescapable," a conviction "may not rest on the piling of inference upon inference or on conjecture and speculation" (quotation and citations omitted). Id.

To convict the defendant on the theory of felony-murder, the Commonwealth was required to prove beyond a reasonable doubt that the defendant committed the homicide while engaged in the commission of aggravated kidnapping. See Commonwealth v. Matchett, 386 Mass. 492, 502 (1982). See also Commonwealth v. Fredette, 480 Mass. 75, 86 (2018) (aggravated kidnapping may serve as predicate felony for felony-murder conviction without violating merger doctrine). Aggravated kidnapping, in turn, required that the Commonwealth prove that the defendant kidnapped the baby "while armed with a dangerous weapon and inflict[ed] serious bodily injury thereby upon [the baby]." G. L. c. 265, § 26, third par. Section 26 defines "serious bodily injury" as "bodily injury which results in a permanent disfigurement, protracted loss or impairment of a bodily function, limb or organ or substantial risk of death." Id.

The judge found, and the defendant urges on appeal, that there was insufficient evidence to prove serious bodily injury to the baby. The judge reasoned that there were no visible

signs of injury or trauma to the baby.  Although a medical expert testified about the effects of the injuries to the victim on the baby and the effects of removal of the baby from the victim, the judge found that the alleged injury to the baby rested on knowledge outside the jury's expertise.  Additional expert testimony, according to the judge and the defendant, was required for the Commonwealth to prove aggravated kidnapping beyond a reasonable doubt.

The judge and the defendant correctly note that a conviction may not rest on conjecture or speculation.  See Trotto, 487 Mass. at 716.  Accordingly, expert testimony is needed where an issue is outside the general knowledge and experience of the jury.  Commonwealth v. Scott, 464 Mass. 355, 364 & n.9 (2013).  In Scott, we concluded that the Commonwealth would not be able to meet its burden of proof as to the severity of an injury merely through medical records containing technical terminology, because such terminology was not in the jury's common knowledge or experience.  Id. at 363-364.

This case, however, is unlike Scott.  Viewing the evidence in the light most favorable to the Commonwealth, the Commonwealth did not need additional testimony to establish that there was both a bodily injury to the baby and that this injury created a substantial risk of death.  The victim, who was the mother of the baby, was killed, and the baby was removed from

the victim's womb, along with all of the victim's reproductive organs, by someone without medical training.[5]  This was done at the crime scene itself, and obviously not in a sterile environment.

The jury received evidence of the significant injuries to the victim, including fatal blunt force trauma to her head, asphyxia by ligature strangulation, and incision of her abdomen. The Commonwealth's expert in obstetrics testified that the death of a mother would create a loss of blood flow and oxygen to the fetus.  The jury were also told that the longer this loss continues, the more harm and danger there would be to the baby. We conclude that the loss of blood and oxygen, caused by the killing of the mother, presents a bodily injury to the fetus. Indeed, we have previously recognized, in other contexts, the effects to a fetus of injuries to the mother.  See, e.g., Commonwealth v. Ronchi, 491 Mass. 284, 296 (2023) (holding that injuries need not be inflicted directly on viable fetus for defendant to be criminally liable for death of fetus); Commonwealth v. Cass, 392 Mass. 799, 806-807 (1984) (for

---

[5] As part of her third-party culprit defense, the defendant suggests that Rodriguez had the medical knowledge to remove the baby because he was a personal care assistant for an elderly person.  Nothing about being a personal care assistant for an elderly person suggests Rodriguez had the necessary medical training.

purposes of vehicular homicide statute, recognizing that infliction of injuries upon mother that results in death of viable fetus is homicide). With the obstetrician's expert testimony, the jury could reasonably infer that the injuries to the victim also inflicted bodily injury on the baby. See Trotto, 487 Mass. at 716 (jury permitted to draw "reasonable and possible" inferences from circumstantial evidence [citation omitted]). This inference did not require knowledge or experience outside that of the jury's or beyond that established through testimony.

Likewise, the jury could reasonably conclude that the inflicted bodily injury created a substantial risk of death. As explained above, the Commonwealth's expert obstetrician testified that the loss of a mother's heartbeat creates significant dangers to a fetus. He explained that the fetus then loses blood, and therefore oxygen, needed to survive. He further explained that there is a narrow window of time during which the fetus can be removed from the mother's body before the fetus will also die. Additionally, the forcible removal of the baby from the mother was not performed according to recognized medical procedures, such as a cesarean section. Nor was it performed by a trained professional in a sterile environment. Rather, it was performed by the victim's murderer at a crime scene. The jury did not need additional expert testimony to

conclude that such actions would create significant risks to the baby, including a risk of death.  The jury could use their common sense to draw such a conclusion.

The Commonwealth thus presented sufficient evidence at trial that the defendant inflicted serious bodily injury upon the baby during the commission of the kidnapping.  A "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Doucette, 408 Mass. at 456, quoting Latimore, 378 Mass. at 677.  We therefore reverse the order allowing the defendant's motion for a required finding of not guilty and reinstate her conviction of murder in the first degree on a theory of felony-murder.

c.  Relief pursuant to G. L. c. 278, § 33E.  Finally, the defendant asks that we exercise our powers under § 33E to reduce the verdict to a lesser degree of guilt.  The defendant proposes several bases upon which we may choose to exercise this extraordinary relief:  (1) that the defendant was suffering from postpartum depression and psychosis at the time of the murder, which contributed to her decision to take the baby; (2) that Rodriguez had a stronger motive for killing the victim than the defendant; (3) that the victim's murder was more consistent with Rodriguez's past actions than with the defendant's; (4) that multiple men were present at the victim's apartment between the night the victim was murdered and the day her body was

discovered; (5) that law enforcement's investigation was inadequate and failed to uncover evidence inculpating Rodriguez; (6) that Rodriguez's actions after the murder suggested he was guilty; (7) that the defendant could not have been involved in the extensive clean-up following the killing; (8) that the defendant's cell phone records indicated that she was not near the crime scene; (9) that Rodriguez, as a personal care assistant, could have had the skills to remove the baby; and (10) that the defendant and the victim were friends with no animosity between them.

"This court has used its extraordinary authority pursuant to § 33E sparingly and with restraint, reducing convictions only in the most compelling circumstances" (quotations and citation omitted). Commonwealth v. Yat Fung Ng, 491 Mass. 247, 272 (2023). Such relief is only warranted if, after review of the entire case and considering "a broad range of factors," we conclude that the defendant's "conviction of murder in the first degree was a miscarriage of justice that warrants a reduction in the degree of guilt." Id., quoting Commonwealth v. Concepcion, 487 Mass. 77, 94, cert. denied, 142 S. Ct. 408 (2021). "In exercising our powers under . . . § 33E, we do not act as a second jury." Commonwealth v. Sawyer, 389 Mass. 686, 704 (1983).

In her request for relief under § 33E, the defendant raises many issues that were presented at trial and argued to the jury. As discussed supra, the defendant successfully introduced evidence suggesting that Rodriguez was a violent man with a motive to kill the victim. The defendant argued at trial that Rodriguez's failure to inquire about the status of the baby when questioned by the police indicated that he already knew what happened to her. The jury heard about Rodriguez's actions around the date of the murder, including his walking from the cemetery. The jury also heard evidence that several men were seen at the victim's apartment, including one man seen climbing through the victim's window. The victim's neighbor also testified about her interactions with one of the men who appeared nervous. Additionally, the jury heard extensive testimony about law enforcement's failure to thoroughly inquire into each of these leads, to investigate Rodriguez, or to test evidence at the victim's apartment. Finally, the defendant argued that she could not have possibly committed the murder and then cleaned up the evidence. There was, however, also overwhelming evidence of the defendant's own involvement in the murder of the victim, which we have described supra.

The jury returned a verdict of guilty on all three theories of murder, even after being presented with well-developed third-party culprit and Bowden defenses. The jury were also properly

instructed to consider both defenses.  "[Because] the issue of the defendant's criminal responsibility was fully and fairly before the jury, . . . justice does not require that their verdict be disturbed."  Commonwealth v. Lunde, 390 Mass. 42, 50 (1983).

On appeal, the defendant only raises three issues for our consideration that were not considered by the jury:  that cell phone records indicated she was not present at the crime scene, that she was suffering from mental illness, and that she had no animosity toward the victim.  We have already considered the first of these issues supra and determined that the records do not exculpate the defendant.  We do not believe either of the other two bases warrants a reduction in the jury's verdict.

At her motion for a new trial, the defendant alleged counsel was ineffective for failing to call a psychiatric expert to testify about her mental illness at the time of the killing. While the defendant does not renew this argument on appeal, she urges us to consider evidence presented to the judge about her mental state.  Specifically, the defendant submitted with her motion two affidavits from an expert in psychiatry who had reviewed the defendant's medical and psychiatric records.  The expert opined that it was "probable" the defendant was suffering from postpartum depression and anxiety at the time of the murder.  The expert also noted that the defendant was at risk

for postpartum psychosis, based upon a history of psychiatric symptoms during pregnancy. It was the expert's opinion that such mental illnesses "could have caused a delusional belief that keeping the victim's baby was appropriate and ethical." Importantly, the expert's opinion only focused on the defendant's actions in taking the baby, not in committing murder. More specifically, the expert referred to the defendant as "taking the baby that was given to her and in believing that she could and should keep the baby as her own." The expert did not specifically address whether such postpartum psychosis could cause the defendant to murder the victim, including in the cruel and atrocious manner that it occurred here.

We have previously found a reduction in a jury's verdict to be more consonant with justice in cases involving a defendant with an impaired mental condition. See, e.g., Commonwealth v. Dowds, 483 Mass. 498, 512-513 (2019); Commonwealth v. Colleran, 452 Mass. 417, 432-434 (2008). In Colleran, supra at 432, we reasoned that a defendant's mental illness "bears on the specific intent required for murder in the first degree based on deliberate premeditation." We also reasoned that where a defendant's conduct was "driven by her mental condition," the killing was not committed in a manner "that judges and juries generally consider extremely atrocious or cruel." Id. at 434. In Colleran, the defendant had impulsively murdered her own

child while experiencing profound depression and psychosis. Id. at 420-422. An expert in forensic psychiatry testified that the defendant's mental illness would typically make a person "commit[] acts profoundly contrary to the person's self-interest," and that the illness impaired the defendant's ability to conform her conduct to the requirements of the law. Id. at 422.

The defendant's mental condition in this case was not as severe as that at issue in Colleran. Here, the defendant's expert could only opine that she was probably suffering from some form of postpartum depression and was at risk of postpartum psychosis. As stated above, the expert did not address the relationship of postpartum depression or the risk of psychosis to the murder, as opposed to taking the baby. Furthermore, nothing in the expert's affidavits suggest that the defendant was incapable of forming the specific intent necessary for deliberate premeditation, or that the defendant's actions were so impulsive that they could not be considered extremely atrocious or cruel. See Commonwealth v. Whitaker, 460 Mass. 409, 421 (2011) ("The defendant's psychological diagnosis, while significant, does not reach this level of severity, and there is no evidence that it was intertwined with the victim's killing"). The crime, as evidenced by the photographic exhibits, was atrocious and cruel. Also absent in the expert's affidavits are

any indications that the defendant lacked the capacity to conform her conduct to the requirements of the law or appreciate the wrongfulness of murdering an innocent victim to take her baby. See Colleran, 452 Mass. at 427, quoting Commonwealth v. McHoul, 352 Mass. 544, 547 (1967) (articulating McHoul standard for lack of criminal responsibility).

Moreover, the defendant could have raised a mental impairment claim at trial. Trial counsel discussed the possibility of doing so with the defendant, who was deeply involved in the development of her case. The defendant, however, adamantly protested raising a mental impairment defense because she did not want to admit to any wrongdoing. Thus, not only was there a dearth of evidence indicating that her alleged mental impairment contributed to the commission of the murder, but also the defendant rejected that claim herself. On these facts, we cannot conclude that the defendant's conviction was a miscarriage of justice.

Finally, the defendant asks that we take into consideration that she and the victim were friends and that there was no evidence of animosity between them. Indeed, in Colleran, 452 Mass. at 431, we noted that a lack of animosity may be a factor to consider in our review. In Commonwealth v. Jones, 366 Mass. 805, 808-809 (1975), we reduced the defendant's conviction to manslaughter where "there was no evidence that [the defendant

and the victim] had had prior trouble."  That factor, however, weighed in our analysis of whether the defendant possessed the requisite malice for a conviction of murder in the second degree.  Id. at 809.  The fact that the defendant and the victim were acquaintances with no animosity supported a conclusion that the killing was done "in the heat of sudden affray or combat" (citation omitted).  Id.  The same cannot be said here.  The jury heard evidence that the victim and the defendant were not friends.  The jury also heard evidence suggesting that the defendant thoughtfully planned the murder in order to possess the victim's baby.  This was not a case in which the lack of animosity negated the essential elements of the defendant's conviction.

For the foregoing reasons, and after reviewing the entire record, we decline to exercise our powers under § 33E.

3.  Conclusion.  We hold that the defendant's trial counsel was not ineffective for failing to call a cell phone expert to testify about the location of the defendant's cell phone, where the decision was reasonably made and the evidence would not have affected the jury's conclusion.  We therefore affirm the order denying the defendant's motion for a new trial.  We reverse, however, the order entering a required finding of not guilty on the defendant's conviction of murder in the first degree on the theory of felony-murder.  The evidence was sufficient for a fact

finder to conclude that the defendant committed aggravated robbery beyond a reasonable doubt.  We thus reinstate the defendant's conviction of murder in the first degree on a theory of felony-murder.  Finally, finding no reason to exercise our extraordinary powers pursuant to § 33E, we decline to disturb the jury's verdict in this case.

<u>So ordered</u>.